**MACFADDEN HOLDINGS, INC., and Macfadden Acquisitions Corp., Plaintiffs,**

v.

**JB ACQUISITION CORP., BJ Holding Corp., and Reliance Capital Group, L.P., Defendants.**

No. 86 Civ. 5449 (SWK).

United States District Court, S.D. New York.

Aug. 2, 1986.

Wilkie, Farr & Gallagher, New York City by Louis A. Craco, Richard L. Posen, Brian E. O'Connor and Jeanne M. Luboja, for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Arthur L. Liman, Max Gitter, Francis M. Holozubiec, Blair C. Fensterstock and Andrew P. Donnellan, Jr., for defendants.

### MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiffs Macfadden Holdings, Inc. and Macfadden Acquisition Corp. (collectively "Macfadden") and defendants JB Acquisition Corp., BJ Holding Corp., and Reliance Capital Group, L.P., (collectively "Reliance") are competing tender offerors for outstanding common stock of John Blair and Company ("Blair"). Their struggle has involved litigation in the Delaware state and federal courts as well as in Washington, D.C.

In this case, Macfadden alleges three causes of action against Reliance. First, Macfadden claims that Reliance's tender offer for outstanding shares of Blair common stock contains material misrepresentations of fact, and Reliance's acceptance of shares for payment tendered pursuant to the offer violates Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e)(1982) (the "Williams Act"). Second, Macfadden claims Blair's failure to disclose its plans regarding the expiration date of its tender offer violates Rule 14d–6(d) promulgated under the Securities and Exchange Act of 1934. 17 C.F.R. § 240.-14d–6(d) (1985). In Count Three, Macfadden claims that Reliance's failure to pay promptly for the shares tendered pursuant to its tender offer violates Rule 14e–1(c) promulgated under the Securities and Exchange Act of 1934. 17 C.F.R. § 240.14e–1(c) (1985).

Macfadden seeks a declaration that Reliance's acceptance for payment of Blair shares was illegal and invalid, and a preliminary and permanent injunction prohibiting Reliance from refusing to allow Blair shareholders to withdraw their shares from Reliance and compelling Reliance to return the shares they have accepted for payment but for which they have not promptly paid.

The parties stipulated that Macfadden would submit a motion for summary judgment on an accelerated basis. This case is now before the Court on plaintiff's summary judgment motion. Although Reliance did not file a cross-motion for summary judgment, it asks that summary judgment be granted in its favor and that the Court dismiss the complaint.

A motion for summary judgment lies only when there is no genuine issue of material fact. This Court's role is to determine whether there are issues to be tried. *Heyman v. Commerce and Ind. Ins. Co.,*

524 F.2d 1317, 1319–20 (2d Cir.1975). The burden is on the moving party to show that no such issues exist. *Adickes v. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Heyman*, 524 F.2d at 1320. Nonetheless, "the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (emphasis in original). Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.

The parties have made extensive submissions to the Court which the Court has considered. The relevant facts are not disputed. The Court finds there is no issue as to any material fact and the following represents the Court's findings of fact.

## BACKGROUND

Macfadden is in the publishing business, selling more than 35 million magazines annually. It also owns a 50 percent interest in a television production company. Blair is a communications company with interests in direct mail marketing services, television and radio station ownership, and television programming. Blair's television and radio stations are licensed pursuant to the Federal Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (1982) (the "Communications Act"). *See* 47 U.S.C. § 301. Reliance's major businesses are insurance, real estate, and consulting and technical services.

The Communications Act prohibits the transfer of a broadcast license without permission from the Federal Communications Commission ("FCC"). 47 U.S.C. § 310(d). The FCC considers applications for transfer of a broadcast license as if the proposed transferee were applying for the license under 47 U.S.C. § 308, which establishes standards for awarding licenses. 47 U.S.C. § 310(d).

In ordinary circumstances, an applicant for transfer of a broadcast license must follow the "long form" application proce-dures mandated in 47 U.S.C. § 309. However, the FCC has implemented a special procedure governing license transfer in the context of tender offers for broadcast companies. *See Policy Statement on Tender Offers and Proxy Contests*, 59 R.R.2d 1536 (1986). A tender offeror may make a "short form" application to the FCC for a special temporary authorization (STA) to have a voting trusteeship operate the broadcasting company pending receipt of long form approval. If the short form application is approved, the trustees would control the stock of the broadcast company in the period between consummation of the tender offer and receipt of long form approval. Once short form approval is obtained, the offeror may consummate the tender offer and pay for tendered shares, even if the FCC has not yet granted long form approval.

## THE COMPETING TENDER OFFERS

On April 22, 1986, Macfadden commenced a hostile tender offer for all outstanding shares of Blair common stock at $25.00 per share. The offer was scheduled to expire at midnight on May 19, 1986. The offer was conditioned upon receipt of long form approval, or, at the discretion of Macfadden, short form approval, and upon the receipt of at least 5.4 million shares. Macfadden named Hugh L. Carey as trustee on its short form application.

Blair, an unwilling target, negotiated a merger agreement with Reliance, which was signed on June 2, 1986. Pursuant to the merger agreement, Reliance would make a tender offer for up to 8 million and at least 5.9 million shares of Blair common stock at $27.00 per share.

Reliance commenced its tender offer on June 5, 1986. The offer was scheduled to expire at midnight, July 2, 1986. Reliance reserved the right to extend the offer. Furthermore, "[pursuant] to the Merger Agreement, the Purchaser has agreed to keep the Offer open for a period equal to at least the lesser of 60 days and the date on which all conditions precedent to the obligations of the Purchaser to purchase any Shares in the Offer are satisfied or

waived...." Reliance's June 5, 1986 Tender Offer at 3.

One condition to the offer was FCC approval of Reliance's short form application. The tender offer states, "[i]t is also a condition to the Offer that the ... [FCC] shall have approved or consented to certain voting trust arrangements pursuant to which the four non-management directors of [Blair] will act as trustee under a voting trust agreement [short form approval]...." *Id.* at *1.* Pursuant to this condition, the offer informs shareholders "the Purchaser shall not be obligated to purchase any Shares if ... the FCC shall not have approved or consented to the voting trust arrangement set forth in the application (Short Form Approval)...." *Id.* at 20. In fact, the Offer states that Reliance could not accept shares for payment without FCC approval. "To enable the Purchaser to accept Shares for payment within the time frame contemplated by the Offer ... the Purchaser will seek prompt FCC short form approval ... prior to obtaining the final FCC Long Form Approval...." *Id.* at 22. The offer named Blair's four non-management directors, Frank K. Mayers, Herbert M. Shayne, Jackson W. Smart, Jr., and Robert L. Stone, as trustees. *Id.*

The offer allowed shareholders to withdraw tendered shares until midnight, June 25, 1986. Shareholders could also withdraw tendered shares after August 3, 1986, if the shares had not yet been accepted for payment. Regarding the payment for shares, the offer states:

the Purchaser will accept and pay for shares validly tendered on or prior to the Expiration Date and not properly withdrawn ... as soon as practicable after the latest of (i) the Expiration Date, (ii) the satisfaction or waiver of the conditions of the Offer, including the approval or consent of the FCC to the voting trust arrangement ... (the "Short Form Approval") ... (iii) the expiration or termination of the waiting period under Title II of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ... and (iv) ... the expiration of any additional withdrawal period resulting from the com-

mencement of a tender offer for shares by another bidder....

*Id.* at 3.

The offer also describes the procedure for acceptance for payment of and payment for shares. "The Purchaser expressly reserves the right, in its sole discretion, to delay the acceptance for payment of, and the payment for, Shares in order to comply in whole or in part with any applicable laws." *Id.* at 4. The offer states, "the Purchaser shall be deemed to have accepted for payment (and thereby purchased) Shares...." when it gives notice to the depositary that the shares have been accepted. *Id.* at 4. The offer distinguishes between acceptance for payment and actual payment, contemplating that acceptance for payment would occur prior to payment. "In all cases, payment for Shares accepted for payment pursuant to the Offer will be made only after timely receipt by the depositary of certificates for such shares...." *Id.* Once Reliance accepted the shares for payment, it would pay for them by "deposit of the purchase price for such Shares with the Depositary, which will act as agent for tendering Shareholders for the purpose of receiving payment from the Purchaser and transmitting payments to tendering Shareholders." *Id.* The Offer also indicated that there might be a delay between acceptance for payment and actual payment if more than 8 million shares were tendered and proration were required. In that instance, Reliance did not expect to pay for any shares "until approximately 10 NYSE trading days...." *Id.* at 4–5. Reliance informed shareholders that "[u]nder no circumstances will the Purchaser pay interest by reason of any delay in making such payment." *Id.* Finally with regard to payment, the Offer stated "if any tendered Shares are not accepted for payment or paid pursuant to the Offer, certificates for such unpurchased Shares will be returned, as promptly as practicable following the expiration, termination, or withdrawal of the Offer." *Id.* at 5.

Responding to the June 5 Reliance offer, Macfadden made another tender offer on June 12, 1986 for up to 8 million and at

least 5.9 million shares of Blair common stock at $30.00 per share. The expiration date for the offer was midnight, July 10, 1986, and withdrawal rights expired at midnight, July 2, 1986. Although Macfadden had received short form approval for its April 25 tender offer, its June 12 offer was again conditioned on receipt of FCC short form approval should the FCC require such approval once again.[1] Macfadden's June 12 offer also described the pending Reliance offer, stating that it was conditioned on receipt of FCC short form approval.

Not to be outdone, Reliance amended its offer on June 19, 1986, this time seeking at least 5.9 million and up to 7 million shares of Blair common stock at $31.00 per share. Both the offer and withdrawal rights expired at midnight, July 2, 1986, unless extended. The offer stated:

> the Purchaser will accept and pay for shares validly tendered on or prior to the Expiration Date and not properly withdrawn ... as soon as practicable after the latest of (i) the Expiration Date, (ii) the satisfaction or waiver of the conditions of the Offer, including the approval or consent of the FCC to the voting trust arrangement ... (the "Short Form Approval") and (iii) the expiration of any additional withdrawal period resulting from the commencement of a tender offer for Shares by another bidder....

Reliance's June 19, 1986 Tender Offer at 3.

The Reliance offer again stated "It is a condition to the Offer that the ... [FCC] shall have approved or consented to certain voting trust arrangements [short form approval]...." *Id.* at 1. Reliance stated it was not obliged to purchase any shares if "(a) fewer than 5,900,000 shares ... are validly tendered ... (b) the FCC shall not have approved or consented to the voting trust arrangement ... (short form approval) or (c)...." *Id.* at 4–5.

On June 26, 1986, Macfadden increased its offer to $32.00 per share, this time for at least 5.9 million and up to 7 million shares of Blair common stock. The offer was to expire unless extended at midnight, July 10, 1986, and withdrawal rights were to expire at midnight, July 2, 1986.

On July 2, the expiration date of Reliance's offer, Reliance had still not received FCC short form approval. Reliance announced that it was extending its offer and withdrawal period until midnight, July 3, 1986. Macfadden announced that if at least 4.6 million shares were tendered into its tender offer by 4:00 p.m. on July 3, Macfadden would not tender its Blair stock into the Reliance tender offer.[2]

On July 3, Reliance sent a letter to the FCC requesting an immediate decision on its short form application. In light of Macfadden's July 2 announcement, Reliance feared that without FCC approval of its short form application Blair shareholders would not be able to decide between the competing tender offers. Blair entered the fracas, announcing that Macfadden could not purchase tendered shares because its short form approval had been stayed by the Court of Appeals for the District of Columbia Circuit.[3] Blair also announced that it would declare a dividend of $1.50 per share on all shares not purchased in the front end of the tender offer. Macfadden countered by announcing it was considering increasing its own offer. It also announced it had failed to receive the 4.6 million shares it had sought. Finally, Reliance stated that if it did not receive a majority of shares by midnight, it would extend its offer and the associated withdrawal rights until midnight, July 7, 1986.

On July 7, Reliance announced that 10,-046,710 shares had been tendered into its

**1.** The FCC affirmed the short form approval on July 7, 1986.

**2.** Macfadden was considering tendering its approximately 1.2 million Blair shares to Reliance due to the structure of Reliance's offer. If Reliance's offer was successful, it would pay $31 per share for up to 7 million shares. In the second step merger—the "back end" of the

deal—shares tendered and not purchased and non-tendered shares would be exchanged for a package of debentures and shares of a Blair subsidiary. Blair also announced it would declare a $1.50 per share dividend on these "back end" shares.

**3.** The Court of Appeals lifted the stay on July 3, 1986.

offer by midnight on July 3rd, and that it "had accepted for payment, subject to receipt of FCC approval of voting trust arrangements, 7,000,000 shares of John Blair and Company common stock, on a pro-rata basis, in its tender offer which expired at midnight on July 3, 1986." Affidavit of Michael J. Boylan, sworn to July 11th, 1986, Exh. O. Approximately 7 million shares were tendered to Reliance after 4:00 p.m. on July 3rd.

On July 9, 1986, Macfadden announced new terms for its offer. While Macfadden continued to offer $32.00 in cash for up to 7 million shares of Blair stock, it offered to increase consideration in the second step of the merger by offering $2.00 in cash per share in addition to the stock it would issue.

On July 17, 1986, while Reliance still held the tendered shares, the FCC rejected Reliance's short form application because the proposed trustees were not sufficiently independent. Although Macfadden demanded that Reliance release all outstanding shares, Reliance declined to do so and filed a new short form application, this time naming former Senator Eugene McCarthy as trustee. On July 30, 1986, the FCC granted this new short form application but stayed its effect until 5:30 p.m. on August 1, 1986.

## THE APPLICABLE LAW

Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e) reads in relevant portion:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading ... in connection with any tender offer or ... any solicitation of security holders in opposition to or in favor of any such offer....

The purpose of the Williams Act is to " 'insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information.' " *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 105 S.Ct. 2458, 2463, 86 L.Ed.2d 1 (1985),

*quoting Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). To this end, Section 14(e) requires persons making tender offers to make full disclosure of material information. *Id.* 105 S.Ct. at 2464. Thus, in deciding a case under Section 14(e), protecting the shareholders by guaranteeing a fair bidding process is a court's primary concern. *See Piper v. Chris-Craft Industries,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977).

In order to succeed on its claim under Section 14(e), Macfadden must show that Reliance misrepresented or omitted to disclose a material fact, that Macfadden relied to its detriment on Reliance's misrepresentation or omission, and that Reliance made the representations or omissions with intent to deceive. *Caleb and Co. v. E.I. DuPont de Nemours and Co.,* 599 F.Supp. 1468, 1474 (S.D.N.Y.1984). *See Chris-Craft Industries v. Piper Aircraft Corp.,* 480 F.2d 341, 362 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

The standard for materiality of an omitted or misrepresented fact in a tender offer is the same as in a proxy content. *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140, 1146–1148 (2d Cir.1979). As announced in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) the standard for materiality is:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having sig-

nificantly altered the "total mix" of information made available.[4]

To satisfy the intent requirement of Section 14(e), a plaintiff must show the defendant either knew the material facts which were misstated or omitted or failed to ascertain such facts when they were available. *Chris-Craft*, 480 F.2d at 364. The key to the scienter requirement is culpability. *Id.* at 362. Thus, knowledge of falsity or reckless disregard for the truth also satisfies the scienter requirement. *Id.* at 363; *Pryor v. United States Steel Corp.*, 591 F.Supp. 942, 956 (S.D.N.Y.1984), *aff'd in part and rev'd in part on non-relevant grounds*, 794 F.2d 52 (2d Cir.1986). Moreover, circumstantial evidence may be sufficient to prove intent. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390–91 n. 30, 103 S.Ct. 683, 691–92 n. 30, 74 L.Ed.2d 548 (1983); *TSC Industries*, 426 U.S. at 463, n. 24, 96 S.Ct. at 2139, n. 24.

A plaintiff need not show reliance upon an omission. *Horowitz v. Pownall*, 105 F.R.D. 615, 620 (D.Md.1985); *Caleb*, 599 F.Supp. at 1474–75. However, a plaintiff must show reliance on a misrepresentation. When a tender offeror is the plaintiff, it can satisfy this element by showing shareholder reliance. *Chris-Craft*, 480 F.2d at 375. Such reliance may be presumed if the misrepresentation is material. *Id. See Lewis v. McGraw*, 619 F.2d 192, 195 (2d Cir.), *cert. denied*, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980). Similarly, a tender offeror has standing to seek an injunction for a violation of Section 14(e). *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366, 372 (6th Cir. 1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Humana, Inc. v. American Medicorp, Inc.*, 445 F.Supp. 613, 616 (S.D.N.Y.1977).

Macfadden also claims Reliance violated Rule 14d–6(d), 17 C.F.R. § 240.-14d–6(d). That rule provides "[a] material change in the information published or sent or given to security holders shall be promptly disclosed to security holders in addition to tender offer materials." This provision requires prompt notification to shareholders of material changes in the information filed with the SEC. *Cardiff Acquisitions, Inc. v. Hatch*, 751 F.2d 917, 921 (8th Cir.1984). The purpose of the Rule is to protect target company shareholders faced with a tender offer decision by imposing disclosure requirements on the tender offeror. *Pryor v. United States Steel Corp.*, 794 F.2d 52 (2d Cir.1986). A private right of action exists to enforce the provision. *See id.* (recognizing private right of action under Section 14(d)(6) ).

Finally, Macfadden claims Reliance violated Rule 14e–1(c), 17 C.F.R. § 240.14e–1(c), which prohibits a tender offeror from failing to pay "the consideration offered or return the securities deposited by or on behalf of security holders promptly after the termination or withdrawal of a tender offer." Whether payment is prompt is a matter of reasonableness, to be determined in light of the circumstances of a particular tender offer and the customary practice of the financial community. *Pryor*, 591 F.Supp. at 962; *Caleb*, 599 F.Supp. at 1473. The date for measuring whether payment is prompt is the date a tender offer is terminated. *Id.* at 1474. Finally, a private cause of action exists to enforce Rule 14e–1(c). *Caleb v. E.I. Du-*

---

**4.** Although both *Prudent* and *TSC* involved omitted facts, *Prudent's* discussion of the standard for materiality of omissions indicates the same standard applies to misrepresentations. *See Prudent*, 599 F.2d at 1146 (court refers to cases involving omissions and misrepresentations when discussing the appropriate standard for omissions). This approach is also logical, as the materiality of a fact does not depend on whether it was misrepresented or omitted. This analysis is confirmed by the applicable regulations. Rule 14d–1(b) states that all terms used in Rules 14d and 14e have the same meaning or as in Rule 12b–2. Rule 12b–2 defines material as "those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to buy or sell the securities...." Thus, the key phrase in defining materiality, "substantial likelihood", is the same under the Rules and *TSC*. The Second Circuit adopted this test for misrepresentations and omissions in *Seabord World Airways, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 360–61 (2d Cir.1979).

*Pont de Nemours and Co.*, 615 F.Supp. 96, 101–102 (S.D.N.Y.1985).

## ALLEGED MISREPRESENTATIONS AND NONDISCLOSURES

In its complaint, Macfadden states that although Reliance stated in its tender offer that it would not accept Blair shares for payment until it received FCC short form approval, Reliance accepted shares for payment prior to the receipt of FCC approval. Macfadden claims that this was either a misrepresentation, a nondisclosure of a change in material plans, or both, in violation of Section 14(e) of the Williams Act and Rule 14d–6(d). Macfadden claims that Reliance's intentions regarding accepting shares was material because Blair shareholders knew Macfadden was considering increasing its tender offer, and would have wanted to know whether Reliance was planning to accept the shares prior to FCC approval or to return them.

Reliance responds that its tender offer and associated withdrawal rights expired at midnight on July 3, 1986. This, it claims, was pursuant to its tender offer, tender offer amendments, and press releases. It argues that Blair shareholders therefore knew, when they tendered their shares on July 3, that withdrawal rights would not revive until August 3. Thus, the fact that Reliance accepted shares for payment did not affect the status of tendered shares— they could not be withdrawn in any event. In fact, Reliance argues, by accepting shares for payment it actually gave tendering Blair shareholders more rights because it waived all conditions to payment except FCC short form approval. Finally, Reliance argues that Blair shareholders tendered into its offer because its tender offer was more valuable than Macfadden's.

Macfadden also argues, although not in its complaint, that Reliance's naming of a new trustee constitutes a material change in the terms of its offer, and that it had to be disclosed to shareholders.[5] Macfadden further argues that Reliance's failure to disclose that it would renew its application for short form approval constitutes a material omission.

■ Regarding Reliance's "acceptance for payment" representations, the Court first must consider whether there was a misrepresentation about the terms for accepting shares for payment.

As described above, a number of terms in the Reliance tender offers indicate that Reliance would not accept shares for payment until FCC short form approval was obtained. For example, Reliance's June 5 tender offer states that it would seek FCC short form approval "[t]o enable [Reliance] to accept shares for payment...." Reliance's June 5, 1986 Tender Offer at 22. This clearly implies that Reliance could not accept shares for payment until the FCC granted short form approval. Not only did Reliance state it *could* not accept shares for payment until after FCC approval, it also stated it *would* not accept them. *Id.* at 3. Reliance repeated this in its June 19 tender offer at page 3. Finally, Reliance also stated that it reserved the right to delay acceptance of shares for payment in order to comply with applicable laws. *Id.* at 4. This indicates it would not accept shares for payment until it received FCC approval.

Furthermore, the offer states that once Reliance accepted shares for payment, it had purchased them. Reliance June 5, 1986 Tender Offer at 4. After acceptance, Reliance would notify the depositary that shares had been accepted and the depositary would pay upon actual delivery of shares to the depositary. *Id.* The only possible delay in payment Reliance disclosed its tender offers would be due to prorating shares if more than 8 million shares were tendered. *Id.* Reliance did not inform shareholders there would be any delay in payment while it awaited FCC approval. Finally, Reliance stated that any shares not accepted for payment would be returned promptly. *Id.* at 5. Thus, once Reliance accepted shares for payment, the

---

**5.** Since this occurred only after Macfadden filed its complaint, and since this issue was briefed and argued by the parties, the Court deems the complaint amended to include this claim. *See* Fed.R.Civ.P. 15(a).

only delay shareholders expected would be due to proration. Reliance did not say it would delay payment while awaiting FCC approval.

Reliance argues, however, that other representations in the tender offers and press releases indicate that the offer and withdrawal rights expired on July 3, and that withdrawal rights would not revive until August 3 if the shares had not yet been accepted for payment. Therefore, shareholders who tendered on July 3 knew they would not get their shares back until August 3, regardless of whether Reliance accepted the shares for payment or not, according to Reliance.

The Court finds Reliance's argument is misdirected and without merit. Regardless of when the offer expired or when withdrawal rights were terminated, Reliance stated that it would promptly return shares that had not been accepted for payment and paid for, subject only to the proration delay discussed above. Reliance also said it would not accept shares for payment prior to receipt of FCC short form approval. Thus, even if the withdrawal period had ended, Reliance, by the terms of its own tender offers, was obliged to return shares tendered if the FCC had not granted short form approval. The Court notes that Reliance does not argue it held shares to allow for proration.

Reliance also argues that the provisions of the tender offer which state that it would not accept shares for payment and pay for shares prior to FCC approval indicate simply that Reliance could not accept *and* pay for shares, but it could simply accept them. This interpretation of these provisions is contradicted by the language of the provisions and defies common sense.

On July 3, when Reliance issued a press release "extending" the expiration date to midnight that night, it did not disclose any change in its intentions regarding acceptance for payment. On July 7, however, Reliance announced that it "had accepted for payment, subject to FCC approval of voting trust arrangements, 7,000,000 shares of John Blair and Company common stock, on a pro rata basis, in its tender offer which expired at midnight on July 3, 1986." Affidavit of Michael J. Boylan, sworn to July 11, 1986, Exh. O. Thus, Reliance did what it said it would not and could not do: accept Blair shares for payment prior to the receipt of FCC short form approval. In view of this conduct the Court finds that Reliance misrepresented the "acceptance for payment" terms. Reliance stated that it would not accept shares for payment prior to receipt of FCC short form approval, but it did so. Reliance also said that once it accepted shares for payment it would pay for them, and it did not pay for them. Finally, Reliance said it would delay acceptance for payment until it received FCC approval, and would return shares not accepted for payment. Yet prior to receiving FCC approval, Reliance accepted the shares for payment instead of returning them. Moreover, Reliance continued to hold these shares without payment for them in clear disregard of the terms of its tender offers.

The Court's next step is to decide whether this misrepresentation was material. The starting point is determining what a reasonable shareholder understood "acceptance for payment" to mean. Although acceptance for payment is not defined in the Securities and Exchange Commission's ("SEC") regulations regarding tender offers, the Federal Trade Commission ("FTC") has defined "acceptance for payment" in its rules regarding tender offers.[6] According to the FTC, "acceptance for pay-

6. The Court adopts this definition because the FTC has authority to regulate tender offers under the antitrust laws. This authority is recognized in the Reliance tender offer. *See, e.g.,* Reliance June 5th Tender Offer at 3. While it is conceivable that "acceptance for payment" could mean one thing under the antitrust laws and another under the securities laws, this would create great confusion and complexity. Furthermore, the SEC has not acted to redefine "acceptance for payment," although the FTC's definition has been in place for three years. Finally, in analyzing the materiality of "accept for payment", the Court is determining what a reasonable shareholder would think it meant, and the FTC definition is relevant to that.

ment of any shares tendered in a tender offer is the consummation of an acquisition of those shares within the meaning of the act." 16 C.F.R. § 801.33 (1985). According to the FTC definition, once the tender offeror accepts shares for payment, it acquires them.

One SEC Rule, 14d–7(a)(2), does deal with "acceptance for payment." In describing the withdrawal rights that are automatically triggered by the announcement of a competing tender offer, the Rule states that "withdrawal may only be effected with respect to securities which have not been accepted for payment in the manner set forth in the bidder's tender offer." 17 C.F.R. § 240.14d–7(a)(2). The implication of this is that once a tender offeror accepts a share for payment, the former shareholders' right to it is extinct.

"Acceptance for payment" has a similar meaning in the Reliance tender offer. Reliance states that once it accepts shares for payment, it has purchased them. Reliance's June 5, 1986 Tender Offer at 4. The tender offer indicates that Reliance would notify its depositary that the shares had been accepted for payment. Once shares were delivered to the depositary, Reliance would pay for them. The only delay Reliance warned shareholders about was for proration of shares, but it estimated that proration for payment would take 10 days. Clearly, once Reliance accepted the shares for payment, it is stated it was bound to pay for them. The Court concludes that a reasonable shareholder reading the Reliance tender offer would have expected that once Reliance accepted his shares for payment, it had purchased them and would promptly pay for them.

Whether the misrepresentation was material depends on whether there is a substantial likelihood that a reasonable shareholder would consider Reliance's statement that it would not accept shares for payment without FCC approval important in deciding whether to tender his shares. As Reliance has indicated, nearly 7 million shares were tendered after 4:00 p.m. on July 3. After 4:00, a shareholder knew the follow-

ing. The FCC had not yet approved Reliance's short form application. It was reasonable to assume it would not do so that day, given the late hour and the impending long weekend. But it was also possible that the FCC could announce its decision early the next week. Furthermore, although Macfadden's offer had lapsed, Macfadden was considering making a higher bid for Blair shares. This bid could also come early the next week. If the Reliance bid were successful, however, and he had not tendered any of his shares, the shareholder would be subject to the back end of the merger.

In light of this, there is a substantial likelihood that a reasonable shareholder would have considered Reliance's "acceptance for payment" plans important. According to the stated terms, if the shareholder tendered and FCC approval was not forthcoming, Reliance, not being able to accept the shares for payment, would return the shares promptly. The shareholder would then have the opportunity to tender to a higher bid if one were forthcoming. If, on the other hand, FCC approval was forthcoming, the offer would expire, Reliance would accept the shares for payment, and he would be paid promptly. In short, the terms for acceptance for payment gave a shareholder a no risk proposition. If he tendered, he would either get payment or get his shares back quickly enough to tender into another bid.

Reliance makes a number of points regarding materiality. First, it argues Blair shareholders tendered into Reliance's offer because it was more valuable. This is irrelevant to the issue of materiality, which requires only that information is substantially likely to be of importance. Second, Reliance argues that by accepting shares for payment, it gave shareholders more rights. However, Reliance also took away a right it had guaranteed: the right to be paid for shares or have them returned.

Since the court has found that Reliance's misrepresentation about its intentions regarding acceptance for payment provisions was material, it presumes shareholder re-

liance on the misrepresentation and resulting damages to Macfadden.

The final element Macfadden must show is intent to deceive. Circumstantial evidence can be used to prove intent, and a showing of reckless disregard for the truth also satisfies the scienter requirement. Culpability is the key in determining this. The Court concludes, based on the misleading language in Reliance's tender offer regarding the terms for acceptance of payment of shares, that Reliance was acting with reckless disregard for the truth. In light of Reliance's deliberate conduct, which blatantly violated the terms of its own tender offers, the Court concludes that its misrepresentation was due to more than just mere negligence. The Court thus grants summary judgment in favor of Macfadden on the Section 14(e) claim.

The 14d–6(d) claim provides an alternative basis for the Court's ruling. Assuming that Reliance did not intend to misrepresent the terms of "acceptance for payment", it is clear that at some point, Reliance decided to do what it said it would not do, namely, accept Blair shares for payment. By requiring disclosure of any change in material information, Rule 14d–6(d) prohibits this. Having already found that the terms for acceptance for payment were material, the Court also finds that the change in plans is material, and Reliance was obligated to disclose it to the shareholders. The Court also finds that this nondisclosure caused harm to Macfadden: had Reliance disclosed its change in plans, Blair's shareholder might not have tendered their shares to Reliance, allowing Macfadden to continue its tender offer struggle. Finally, it is irrelevant that Reliance might not have changed its mind until after the tender offer expired. Rule 14d–6(d) would nevertheless require disclosure and extension of withdrawal rights. *See Cardiff Acquisitions, Inc. v. Hatch,* 751 F.2d 917, 921 (8th Cir.1984). Reliance thus violated Rule 14d–6(d) when it failed to disclose its change of plans regarding acceptance for payment, and payment.

Summary judgment is thus granted for Macfadden on this claim.

Turning briefly to the allegations regarding Reliance's reapplication to the FCC and the change in the proposed trustee, the Court concludes that neither action violates Section 14(e) or Rule 14d–6(d). First, the Court concludes that in a two step merger, the back end of which will result in notes issued by the merged company, the identity of the trustee is material. In the event long form approval is rejected, the trustee would be responsible for selling the tendered shares. Those shares which were tendered and not redeemed for cash would thus be redeemed with the proceeds. Shareholders would thus consider the identity of the trustee to be important. Reliance, however, did not misrepresent the identity of the trustees. Reliance stated in the tender offer that it proposed Blair's four incumbent independent directors to act as trustees, and it did so. The only possible ground for liability would be for nondisclosure under Rule 14d–6(d), but the change in trustee to former Senator Eugene McCarthy was not material. He had already been approved by the FCC as a "short form" trustee in another case, and is thus qualified for the job.

Finally, the Court finds no omission in Reliance's failing to state it would reapply for FCC approval. It is implicit in their tender offer that they would continue to seek approval until they received it.

## PROMPT PAYMENT

On July 3, 1986 when Reliance's offer "expired", its prompt payment obligations began. Reliance still has not paid for the Blair shares. Whether this violates the Rule 14(e)–1(c), however, is to be determined based on all the circumstances of the offer. Reliance argues that based on SEC interpretive rulings and expert commentators, they are allowed to withhold payment for tendered shares pending regulatory approval of the deal. However, Reliance accepted a greater burden than this interpretation of the prompt payment rule requires. It stated that it would pay for shares as

soon as it accepted them. Reliance did not state that it would delay payment until it received FCC approval. Having assumed a higher burden than the law requires, Reliance cannot now relinquish that burden.

■ Nevertheless, the Court does not find that Reliance violated the prompt payment rule. Reliance stated in its tender offer that it would return shares if it did not pay for shares promptly. Reliance did not return the shares, but accepted them for payment and held them. Thus, Reliance violated its tender offer by not returning the shares. It did not, however, violate the prompt payment rule by failing to pay for them.

### REMEDY

■ The Court has carefully considered the appropriate remedy for Reliance's violations. In a misrepresentation and nondisclosure case, the appropriate remedy is generally disclosure of the information and an extension of withdrawal rights. *See Cardiff Acquisitions, Inc. v. Hatch,* 751 F.2d 917, 921 (8th Cir.1984); *Sonesta Int'l Hotels Corp. v. Wellington,* 483 F.2d 247, 255 (2d Cir.1973); *Commonwealth Oil Refining Co., Inc.,* 394 F.Supp. 267, 281–82 (S.D.N.Y.1975).

■ This case, however, is in an unusual posture. The FCC has now approved Reliance's short form application. Ordering Reliance to disclose that it would accept Blair shares for payment prior to FCC approval would be irrelevant, illogical and ineffective. A stronger remedy is thus required.

In *Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc.,* 425 F.2d 842, 845 (2d Cir.1970), the Court faced a similar problem. In *Butler,* the Second Circuit affirmed the granting of a preliminary injunction prohibiting the defendants from consummating an exchange offer after the District Court found the defendants had made material misrepresentations. The Court found that the normal remedy for such misrepresentations—disclosure and extended withdrawal rights—was not appropriate because the consummation of the deal was only six days away. The disclo-

sure procedure could not work in such a short time. The Second Circuit affirmed the preliminary injunction and gave defendants the opportunity to make a new tender offer on full disclosure.

As in *Butler,* this Court "cannot conscientiously allow [Reliance] to escape unscathed from the consequences of inaccurate statements which it could easily have avoided and which may have some tendency to effect the decision of [Blair] stockholders with respect to the [tender] offer." *Id.* at 842.

The Court finds that a broader and more effective remedy than disclosure and withdrawal, namely release of all Blair shares Reliance currently holds, is appropriate in this case. Release of the shares is necessary to remedy Reliance's unlawful conduct. It is thus ORDERED that Reliance release all Blair shares which it received pursuant to its tender offer which expired on July 3, 1986.

SO ORDERED.